UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| PAULA EARLEY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> GROUPON, INC., ANDREW D. MASON and JASON E. CHILD, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

PLAINTIFF'S COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

806848_1

## INTRODUCTION

1.  This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Groupon, Inc. ("Groupon" or the "Company") between May 14, 2012 and November 8, 2012, inclusive (the "Class Period"), against Groupon and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"). These claims are asserted against Groupon and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

2.  Groupon is a local e-commerce marketplace that connects merchants to consumers by offering goods and services at a discount.

3.  During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and prospects. As a result of defendants' false statements, Groupon stock traded at artificially inflated prices during the Class Period, reaching a high of $13.05 per share on May 16, 2012.

4.  On November 8, 2012, Groupon issued a press release announcing its third quarter 2012 earnings results, reporting disappointing revenue results. The release reported a net loss of $3.0 million, or $0.00 diluted earnings per share ("EPS"), and revenue of $568.6 million for the third quarter ending September 30, 2012. Analysts expected revenues of $590.12 million for the third quarter of 2012. Additionally, the Company forecast revenue in the range of $625 million to $675 million for the fourth quarter of 2012, below analysts' expectations of $633.87 million. The release stated in part:

> "Our solid performance in North America was offset by continued challenges in Europe," said Andrew Mason, CEO of Groupon. "Groupon Goods has evolved into a second major category that our customers clearly love. With deals on everything from designer sunglasses to big-screen televisions to most-wanted toys, we think it will be a great gifting destination this holiday season."

- 1 -

806848_1

5.  As a result of this news, Groupon stock dropped $1.16 per share to close at $2.76 per share on November 9, 2012, a decline of nearly 30%, on volume of 116 million shares.

6.  The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) Much of Groupon's revenue growth was being derived from its non-core, lower-margin Groupon Goods business;

(b) Groupon's business was not growing to the extent represented by defendants; and

(c) Groupon's revenue mix was shifting in a manner which would lead to lower margins.

7.  As a result of defendants' false statements and omissions, Groupon's common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 79% from their Class Period high.

## JURISDICTION AND VENUE

8.  Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

9.  Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District. Groupon has offices located at 600 W. Chicago Avenue, Suite 620, Chicago, Illinois 60654.

10. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

11. Plaintiff Paula Earley purchased Groupon common stock as described in the attached certification and was damaged thereby.

12. Defendant Groupon operates an e-commerce marketplace that connects merchants to consumers by offering goods and services at a discount in North America and internationally. Groupon is headquartered in Chicago, Illinois. Its stock trades in an efficient market on the NASDAQ.

13. Defendant Andrew D. Mason ("Mason") co-founded the Company and is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of Groupon.

14. Defendant Jason E. Child ("Child") is, and at all relevant times was, Chief Financial Officer ("CFO") of Groupon.

15. The defendants named above in ¶¶13-14 are referred to herein as the "Individual Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Groupon's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

17. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Groupon. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Groupon common stock was a success, as it: (i) deceived the investing public regarding Groupon's prospects and business; (ii) artificially inflated the price of Groupon common stock; and (iii) caused plaintiff and other members of the Class to purchase Groupon common stock at inflated prices.

## BACKGROUND

18. Groupon operates an e-commerce marketplace that connects merchants to consumers by offering goods and services at a discount in North America and internationally. The Company provides daily deals on things to do, eat, see and buy in more than 500 markets in 44 countries. The Company provides an online service that lets groups of people create campaigns to pool resources, including money and personal commitments to take action. It allows users to sell products and transact business online. The Company was founded in 2008. In 2011, Groupon launched Groupon Goods, which enables consumers to purchase vouchers for products directly from its website.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

19. On May 14, 2012, Groupon issued a press release reporting its first quarter 2012 earnings results. The Company reported revenue of $559.3 million for the first quarter ending March 31, 2012. Additionally, the Company provided its second quarter 2012 outlook, with revenue expected to be between $550 million and $590 million. The release stated in part:

"We are pleased to report a record quarter that demonstrates our progress in unlocking the opportunity in local commerce for merchants and customers worldwide," said Andrew Mason, CEO of Groupon.

20.  After releasing its first quarter 2012 results on May 14, 2012, Groupon hosted a conference call for analysts, media representatives and investors during which defendants represented the following:

> [MASON:] We've also begun to see the benefits of technology and personalization initiatives in North America. Smart Deals, for example, applies sophisticated algorithms to help give our customers more of [what] they want, high-quality deals, close to where they live and work.
>
> * * *
>
> There are a few more things I'd like to highlight about the last quarter. First, our customer and merchant reach continues to grow. For the first time we served more than 100,000 unique merchants in a quarter, and ended Q1 with 36.9 million active customers. Second, our customer and merchant satisfaction continues to be strong, which I believe is the most important leading indicator of our long-term success. Groupon's customer satisfaction score in the US in March was 83 on a leading market research firm called ForeSee's 100-point scale. That's within approximately two points of ForeSee's five-year average number 1 satisfaction score for online retailers. Our US merchant satisfaction score was 79 compared to the B2B benchmark of 64. We're very proud of these scores. They provide empirical evidence of the value that Groupon provides to our millions of customers and hundreds of thousands of merchant partners.
>
> Third, we are seeing solid early results in our rollout of enhanced merchant support product and services that are part of the Groupon operating system initiative. During the past two months, over 30% of eligible Daily Deal merchants in our pilot cities signed up for Groupon Rewards, our new loyalty program for merchants and their consumers. Though the preliminary data set is small, pilot results show that these customers are more loyal to merchants than their other customers. To highlight another example, Groupon's Scheduler has also seen early success with more than 2,500 merchants signed up to date.
>
> Fourth, more customers are buying through mobile. In April 2012, nearly 30% of our North American transactions were completed on mobile devices compared with 25% just four months ago. We've seen our mobile users drive more incremental revenue and purchase activity than our web only customers with each mobile customer spending over 50% more. Our growth in this very important area has created momentum for our Groupon Now service that offers real-time deals for whenever you're hungry or bored. Groupon Now recently surpassed 1.5 million purchases, doing so in less time and with a smaller footprint than what we achieved when launching Groupon Daily Deals.

\* \* \*

[CHILD:] Now, I'll move on to a review of some of the key operating fundamentals from the quarter. I'll frame my review of the financial fundamentals from Q1 in these three sections. First, revenue leverage, or the interplay between customer growth and revenue per customer expansion, are two key levers for driving growth. Second, operating leverage or the yield we realize on our core operating expenses. Our primary leverage point is our largest bucket of variable expense, marketing. In Q1, consistent with our execution over the past 12 months, we saw significant operating leverage from improved marketing efficiency. And third, strong free cash flow generation and the leverage we get from our balance sheet. Our business model possesses the benefits of a negative operating cycle that are not unusual in online retail, and which continue to drive healthy cash flow dynamics that further strengthen our balance sheet.

\* \* \*

So, the performance we saw in North America was partly due to technology, but it was also due to increases in deal density that we saw through operational efforts. Proximity of deals is the number one driver of purchase behavior by customers. So, by getting more dense deals, we were able to use our technology in order to provide better targeting to customers, give them deals that were more relevant to them.

21. On May 16, 2012, Groupon common stock reached its Class Period high of $13.05 per share.

22. On August 13, 2012, *The Wall Street Journal* published an article on Groupon's revenue:

> Not every dollar of Groupon's revenue is created equal anymore. Will investors get a full explanation when the Internet coupon company reports second-quarter earnings Monday?
>
> Groupon reported a surprising acceleration in its North American business in the first quarter, with net revenue rising 33% from the previous quarter. That was up from the fourth quarter's 11% increase. That improvement, said Chief Executive Andrew Mason, was due to technology that targets customers with coupons they are more likely to buy. That may give investors comfort, because it suggests Groupon isn't relying just on a huge marketing budget to drive growth. Trouble is, it doesn't appear to be the whole story.
>
> Investors will want to dig deeply into the results, which are expected to show net revenue increased 2% quarter over quarter to $573 million and earnings stayed flat at minus two cents a share. Last fall, Groupon started a business called Groupon Goods to sell discounted products, in addition to its core daily deals for restaurants, spas and such. That business took off in the first quarter, driving roughly 10% of

North American gross billings, data provider Yipit says. Notable is how the accounting treatment of this business inflates net revenue growth overall. About 75% of first-quarter Groupon Goods deals were so-called first party deals, Yipit estimates. For these, Groupon takes the products into inventory and accounts for sales on a gross basis, not a net basis.

23. On August 13, 2012, Groupon issued a press release reporting its second quarter 2012 earnings results. The Company reported net income of $28.4 million, or $0.04 diluted EPS, and revenue of $568.3 million for the quarter ending June 30, 2012. Additionally, the Company provided its revenue outlook for the third quarter of 2012, with revenue expected to be between $580 million and $620 million. The release stated in part:

> "We had a solid quarter despite challenges in Europe and continued investment in technology and infrastructure," said Andrew Mason, CEO of Groupon. "We've deepened our relationships with a growing base of merchants and customers worldwide, demonstrating progress as we work to unlock the opportunity in local commerce."

24. After releasing its second quarter 2012 results on August 13, 2012, Groupon hosted a conference call for analysts, media representatives and investors during which defendant Child acknowledged the importance of Groupon Goods to the Company's results:

> Second, on Groupon Goods, direct revenues were material for the first time in [the] second quarter at $65 million compared with $19 million in Q1. Direct revenues are related to the business for which we take title to inventory and sell products directly to the consumer, such as movie tickets, travel vouchers and physical goods. In the second quarter, direct revenues were primarily related to Groupon Goods. These revenues are accounted for on a gross basis, with the cost of inventory captured in cost of revenue.
>
> Note, not all of the Goods business is accounted for on a direct basis. By taking title to inventory, we are able to work directly with a larger universe of suppliers and merchants, set price, confirm stock, manage shipping times, and generally provide a superior end-to-end customer experience. As we developed the infrastructure this quarter, we moved to a model where we could take title to inventory for the majority of shipped products sold in North America.
>
> \* \* \*
>
> In terms of the growth excluding the impact of direct revenue, first, let me point out that direct revenue includes, as we said just a few moments ago, it includes the combination of Goods as well as some of the stuff in our daily deal channels, like

- 7 -

travel vouchers and movie tickets. Specifically, the Goods portion was less than half of the $19 million of direct revenue in Q1. And it was over half in Q2.

If you exclude the direct revenue impact, in other words assume that all of the direct revenue was actually booked as net, we would have grown over 30% year on year versus the 45% that we reported. That's on a global basis. That's not disclosure that we'll likely provide going forward just because it's competitively sensitive, specifically the deal margins that we have in our channels.

25. On issuing this release, Groupon's stock declined 28% from $7.55 per share to $5.51 per share on volume of 62 million shares. However, the stock continued to trade at artificially inflated levels as defendants concealed the extent of the Company's sales problems.

26. Then, on November 8, 2012, Groupon issued a press release announcing its third quarter 2012 earnings results, reporting disappointing revenue results. The release reported a net loss of $3.0 million, or $0.00 diluted EPS, and revenue of $568.6 million for the third quarter ending September 30, 2012. Analysts expected revenues of $590.12 million for the third quarter of 2012. The release stated in part:

> "Our solid performance in North America was offset by continued challenges in Europe," said Andrew Mason, CEO of Groupon. "Groupon Goods has evolved into a second major category that our customers clearly love. With deals on everything from designer sunglasses to big-screen televisions to most-wanted toys, we think it will be a great gifting destination this holiday season."

27. After releasing its third quarter 2012 results on November 8, 2012, Groupon hosted a conference call for analysts, media representatives and investors during which defendants acknowledged that the lower margin Goods business would be a more significant part of its revenues.

28. As a result of this news, Groupon stock dropped $1.16 per share to close at $2.76 per share on November 9, 2012, a decline of nearly 30% on volume of 116 million shares.

29. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

- 8 -

806848_1

      (a)    Much of Groupon's revenue growth was being derived from its non-core, lower-margin Groupon Goods business;

      (b)    Groupon's business was not growing to the extent represented by defendants; and

      (c)    Groupon's revenue mix was shifting in a manner which would lead to lower margins.

30.    As a result of defendants' false statements and omissions, Groupon's common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down nearly 79% from their Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

31.    During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Groupon common stock and operated as a fraud or deceit on Class Period purchasers of Groupon common stock by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Groupon common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Groupon common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

32.    Groupon's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

33. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Groupon who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Groupon common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Groupon has 653 million shares of Class A stock outstanding and 2.3 million shares of Class B stock outstanding, owned by hundreds if not thousands of persons.

36. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a) whether the 1934 Act was violated by defendants;

    (b) whether defendants omitted and/or misrepresented material facts;

(c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) whether the price of Groupon common stock was artificially inflated; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

37. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

38. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

39. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

40. Plaintiff incorporates ¶¶1-39 by reference.

41. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

42. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

806848_1

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Groupon common stock during the Class Period.

43. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Groupon common stock. Plaintiff and the Class would not have purchased Groupon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

44. Plaintiff incorporates ¶¶1-43 by reference.

45. The Individual Defendants acted as controlling persons of Groupon within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Groupon common stock, the Individual Defendants had the power and authority to cause Groupon to engage in the wrongful conduct complained of herein. Groupon controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding plaintiff and the members of the Class damages, including interest;

C. Awarding plaintiff's reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 22, 2013

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)

_s/ James E. Barz_
JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

LAW OFFICE OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff